IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

---

POWERLIFT DOOR CONSULTANTS,
INC., a South Dakota corporation,

               Plaintiff,

v.

GLASS IN MOTION, LLC, a Florida
limited liability company, and SCOTT
ZURBRIGEN, an individual,

               Defendants.

---

CASE NO. _____

**COMPLAINT**

Plaintiff Powerlift Door Consultants, Inc. ("Powerlift"), as and for its Complaint against Defendants Glass in Motion, LLC ("Glass in Motion") and Scott Zurbrigen ("Zurbrigen"), states and alleges as follows:

## INTRODUCTION

1. This is an action for breach of contract, unjust enrichment, unfair competition under the Lanham Act, and a violation of the Florida Deceptive and Unfair Trade Practices Act.

2. Powerlift is an industry-leader in the construction of hydraulic lift doors.

3. Zurbrigen is an architectural consultant and owner of Glass in Motion, a company that purports to construct glass hydraulic lift doors.

4. In the summer of 2019, Zurbrigen approached Powerlift and proposed an exclusive supplier relationship whereby Powerlift would construct the frame and

componentry necessary for a hydraulic lift door and then supply these doors to Zurbrigen who would add glass to the doors and market the doors to high-end architectural clients.

5.      Zurbrigen signed a confidentiality agreement with Powerlift in December 2019 and agreed to protect Powerlift's confidential information and not use such information for Zurbrigen's commercial gain.

6.      In reliance on Zurbrigen's promise to market Powerlift's doors to the high-end architectural market, Powerlift shared countless pages of confidential and trade secret information with Zurbrigen and spent over $234,750 designing, constructing, and shipping four custom-made hydraulic lift doors to Zurbrigen, as Zurbrigen requested.

7.      Zurbrigen submitted one of these hydraulic lift doors to Blackwater Technical Services, Inc. ("Blackwater"), an independent laboratory that specializes in hurricane-approval testing, and Zurbrigen told Powerlift that this door passed Blackwater's hurricane-approval testing.   Powerlift believes Zurbrigen also submitted another one of its hydraulic lift doors to Blackwater for hurricane-approval testing but neither Blackwater nor Zurbrigen will confirm Powerlift's belief.   To this day, Zurbrigen has never shared the results of these Blackwater tests with Powerlift, and Blackwater refuses to release the test results to Powerlift without Zurbrigen's approval.

8.      In June of 2020, Zurbrigen abruptly told Powerlift that he no longer wanted to use Powerlift as his exclusive supplier purportedly because the "fit and finish" of Powerlift's doors no longer met his standards.   Zurbrigen's "fit and finish" excuse concealed his true intentions.   Zurbrigen had contacted one of Powerlift's suppliers to

2

obtain parts necessary to build his own hydraulic lift door just eleven days before Powerlift had shipped the three custom-made hydraulic lift doors that Zurbrigen later claimed had inadequate "fit and finish."

9.     In other words, once Zurbrigen obtained a hurricane-approval rating from Blackwater and the information necessary to design and build his own hydraulic lift door, Zurbrigen had no further use for Powerlift.

10.     By this action, Powerlift seeks to (i) enjoin Glass in Motion and Zurbrigen from designing, building, or selling hydraulic lift doors (ii) require Glass in Motion and Zurbrigen to remove all Powerlift photographs and drawings from Glass in Motion's website, and (iii) recover damages for the harm Glass in Motion and Zurbrigen caused Powerlift, including a recovery of Powerlift's attorneys' fees for Zurbrigen's breach of the confidentiality agreement.

## PARTIES, JURISDICTION, AND VENUE

11.     Powerlift is a South Dakota corporation with its registered office located at 20032 Ridgefield Loop Spearfish, South Dakota 57783.

12.     Glass in Motion is a Florida limited liability company with its principal place of business at 525 E Olympia Ave, Punta Gorda, Florida 33950.

13.     Zurbrigen is a resident of Florida.

14.     This Court has original jurisdiction over this action pursuant to 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331 and 1338(b) because this is a civil action arising under the laws of the United States, including Section 43(a) of the Lanham Trademark Act, 15 U.S.C.

§ 1125(a), and, pursuant to 28 U.S.C. § 1332(a) because this is a civil action between citizens of different states and the amount in controversy exceeds $75,000.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

15.    This Court has personal jurisdiction over Glass in Motion because its principal place of business is located in Florida, and it is doing business in Florida.

16.    This Court has personal jurisdiction over Zurbrigen because he is a resident of Florida.

17.    Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Powerlift's claims occurred in Punta Gorda, Florida.

### FACTS

18.    Powerlift is an industry-leader in the design and manufacture of industrial, custom-made metal hydraulic lift doors.  Powerlift sells its doors to consumers throughout North America and enjoys an excellent reputation built on its superior product construction and performance.

19.    Rick Peterson ("Peterson") and his wife, Patti Peterson, founded Powerlift in 1988.  Powerlift grew shortly thereafter and introduced North America's first production line of hydraulic lift doors in 1992.

20.    Powerlift currently operates 37 manufacturing and service centers in North America, and Peterson remains active in the management of Powerlift and the innovation of Powerlift's hydraulic lift doors.

4

21.     On or about August 16, 2019, a Powerlift representative received an email from Zurbrigen, who described himself as an architectural consultant with an interest in Powerlift's hydraulic lift doors.  Zurbrigen exchanged several emails with Powerlift representatives throughout August 2019, until he connected with Peterson.

22.     Zurbrigen told Peterson he had extensive experience installing architectural glass and that he was well connected with architects and high-end home builders in Florida and across the country.  Zurbrigen also told Peterson that he had approached Powerlift to propose an exclusive supplier arrangement for glass hydraulic lift doors—an area of the market where Zurbrigen believed Powerlift could expand into with his help.

23.     Zurbrigen proposed that Powerlift, with the know-how and expertise to build hydraulic lift doors, would supply its doors to Zurbrigen, who would then add glass to Powerlift's doors and market the doors to high-end home builders and architects.

24.     Powerlift had two manufacturing locations in Florida, and Zurbrigen proposed using these two Powerlift locations to supply doors directly to Zurbrigen.

25.     Peterson and Zurbrigen talked through the fall of 2019 about this exclusive supplier relationship.  Zurbrigen convinced Peterson that this relationship could only succeed if the glass hydraulic lift door met various hurricane-approval certifications.

26.     Zurbrigen proposed an independent laboratory, Blackwater, to perform these hurricane-approval tests on the glass hydraulic lift door.

5

27.     At Zurbrigen's request, Peterson worked with Powerlift engineers to design and build a custom, large-frame 36-foot-by-12-foot hydraulic lift door for the Blackwater hurricane testing ("the First Test Door").

28.     It cost Powerlift $62,000 to design and build the First Test Door.

29.     Powerlift shipped the First Test Door, fully assembled, to Blackwater's testing facility in West Palm Beach, Florida at the end of November 2019.  It cost Powerlift $2,750 to ship the First Test Door.

30.     Upon information and belief, Zurbrigen installed his glass in the First Test Door after it arrived at Blackwater's testing facility in West Palm Beach, Florida.

31.     Blackwater scheduled its hurricane testing of the First Test Door for the first week of December 2019.  The Petersons, who wanted to observe Blackwater's tests, booked airline tickets and a rental home in West Palm Beach, Florida for the first week of December 2019.

32.     Blackwater unfortunately had to delay the start date of the First Test Door's testing, but the Petersons kept their travel plans to tour the Blackwater testing facility and meet Zurbrigen in person.

33.     On December 5, 2019, Zurbrigen met the Petersons at their West Palm Beach rental house to discuss the exclusive supplier relationship between Glass in Motion and Powerlift.

34.     During this meeting, Zurbrigen entered into a Confidentiality Agreement with Powerlift.  A copy of the Confidentiality Agreement is attached hereto as **Exhibit A**.

35.     The Confidentiality Agreement defined "Confidential Information" to include:

> (i) that written information by the disclosing in part or whole, in writing or electronic means is to be considered as Confidential Information, (ii) that orally information disclosed regarding the fabrication, operation, business plan, financial or any aspect of the PowerLift business is to be considered as Confidential Information, and (iii) models, tools or hardware conveyed by written or electronic means by the disclosing party is to be deemed confidential. Such confidential information shall not include information which:
>> (a) was in possession of the receiving party prior to receiving it from the disclosing party, or
>> (b) is or becomes part of the public knowledge or literature by acts other than those of the receiving party after receiving it, or
>> (c) is or becomes available to the receiving party from a source other than the disclosing party, or
>> (d) is or becomes available to a third party from the disclosing party on an unrestricted basis, or
>> (e) is transmitted by a party after receiving notification in writing from the other party that it does not desire to receive any further Confidential Information, or
>> (f) is transmitted after the expiration of this Agreement.

36.     Any party to the Confidentiality Agreement who received Confidential Information was to treat such information as confidential "for a period of 10 years from the date received."

37.     The Confidentiality Agreement also set limitations on the use of Confidential Information by either party:

> A party receiving Confidential Information from the other shall, under penalty of law, make no commercial use, in whole or in part, of any such Confidential information without the prior written consent of the disclosing party; but only to the extent and during the period of time such information is to be treated as confidential under the foregoing provisions of this Agreement.

7

38.     If either party were to breach their obligations, the Confidentiality Agreement included a remedy provision, which stated:

> Both parties agree and understand that in the event of a breach of this Agreement that immediate and irreparable harm will occur. As such, the Parties agree that any uncured breach shall entitle the nonbreaching Party to injunctive relief, without the necessity of showing actual damage or furnishing a bond or other security, as well as the reimbursement of the costs incurred in the prosecution of same, including reasonable attorneys' fees. Nothing contained in this Agreement, however, shall be construed as prohibiting Protected Party from pursuing any other remedy available to it for breach of this Agreement by Receiving Party, including, but not limited to, the recovery of exemplary damages from Receiving Party.

39.     Upon information and belief, Blackwater completed its hurricane-approval testing on the First Test Door and given the rigors of this testing process, Blackwater scrapped the First Test Door after testing was completed.

40.     Zurbrigen assured Peterson that the First Test Door passed Blackwater's hurricane-approval testing.  However, Zurbrigen never sent a copy of the Blackwater report to Powerlift, and Blackwater has taken the position that it will not disclose a copy of the report to Powerlift without Zurbrigen's approval, which he now refuses to give.

41.     Zurbrigen and Peterson spoke on the telephone frequently from the end of 2019 through the first half of 2020 about Zurbrigen's plans to market and sell Powerlift's hydraulic lift doors with Zurbrigen's glass.  During this period of collaboration, Powerlift representatives also shared trade secret and Confidential Information with Zurbrigen.

42.     For instance, on January 27, 2020, Dave Hazelton ("Hazelton") of Powerlift e-mailed Zurbrigen seal information for Powerlift's hydraulic lift door at Zurbrigen's request.

8

43.    The seal information for Powerlift's hydraulic lift door is trade secret and Confidential Information.

44.    On February 2, 2020, Hazelton also e-mailed drawings for the door seal placement to Zurbrigen at Zurbrigen's request.

45.    These door seal placement drawings are Powerlift's trade secret and Confidential Information.

46.    On February 25, 2020, Zurbrigen registered Glass in Motion as a Florida limited liability company.

47.    On March 9, 2020, Zurbrigen emailed Powerlift employee Amanda Bennett ("Bennett") to ask for CAD drawings of the First Test Door.  Bennett sent Zurbrigen the CAD drawings for the First Test Door that same day.

48.    The CAD drawings for the First Test Door are trade secret and Confidential Information.

49.    On March 11, 2020, Zurbrigen emailed Bennett again to request "specs and pictures" from Powerlift to add content to the website of Zurbrigen's newly formed company, Glass in Motion.

50.    Powerlift agreed to share these photographs and drawings with Zurbrigen, so long as Glass in Motion gave attribution to Powerlift for these materials and listed Powerlift as its sole and exclusive supplier on Glass in Motion's website.  Based on this understanding, Bennett created a Dropbox account with the materials Zurbrigen requested.

51.     Powerlift never gave Zurbrigen permission to use these materials on Glass in Motion's website to market Glass in Motion's products without any attribution to Powerlift.

52.     Zurbrigen posted numerous photographs and drawings that he obtained from Powerlift on Glass in Motion's website.   In doing so, Zurbrigen tried to pass these photographs and drawings off as work Glass in Motion created.  None of these photographs or drawings gave proper attribution to Powerlift, and Zurbrigen never listed Powerlift as Glass in Motion's sole and exclusive supplier on its website.

53.     On March 16, 2020, Zurbrigen forwarded Peterson an email he received from Lucas A. Turner ("Turner"), an engineer at Turner Engineering & Consulting, Inc.  Turner states in this email that Zurbrigen engaged him "to make an Approval based on this testing" and Turner addresses numerous questions to Blackwater employees Jeffrey Van Note ("Van Note") and Mike Hanrahan ("Hanrahan") related to the construction and componentry of the First Test Door.  A copy of Turner's March 16, 2020 email is attached hereto as **Exhibit B**.

54.     Zurbrigen asked Peterson to review and comment on Turner's numerous, detailed questions to Van Note and Hanrahan.

55.     Zurbrigen could not answer Turner's questions because Zurbrigen did not construct the First Test Door or any of its componentry.

56.     Peterson directed Zurbrigen to speak to Bennett about the answers to Turner's questions.  Bennett, in turn, asked Zurbrigen to forward a copy of the Blackwater testing report to give Bennett context for the questions Turner asked.

57.     Zurbrigen never forwarded a copy of the Blackwater testing report to Bennett, and Bennett never responded to Turner's questions.

58.     In early 2020, Zurbrigen told Peterson that the market for glass hydraulic lift doors demanded a smaller frame door and a bar top door.  Zurbrigen also told Peterson that Powerlift could sell more doors through Glass in Motion if Powerlift offered smaller frame and bar top doors, and if Powerlift shipped Zurbrigen a rolling door that Zurbrigen could easily market to architects and high-end home builders.

59.     In reliance on Zurbrigen's promise that he could sell more Powerlift doors if he had a greater diversity of options to market and a rolling door, Peterson and the Powerlift engineering team designed and built three additional prototype hydraulic lift doors.

60.     Powerlift first designed and built an 8-foot-by-16-foot small-frame door ("the Second Test Door").

61.     Zurbrigen told Peterson that he wanted both a large-frame door and a small-frame door that passed hurricane-approval testing to market to potential customers, so Zurbrigen asked Powerlift to construct this small-frame door to withstand Blackwater's hurricane-approval testing, which Powerlift did.

62.     The Second Test Door cost Powerlift $57,000 to design and build.

63.     Peterson and Powerlift also designed and constructed a 6-foot-by-12-foot bar top door ("the Bar Top Door").

64.     Zurbrigen told Peterson the Bar Top Door would be displayed in Glass in Motion's showroom in Punta Gorda, Florida.

65.     The Bar Top Door cost Powerlift $65,000 to design and build.

66.     Powerlift also designed and constructed a large-frame hydraulic lift door on wheels ("the Showroom Door").

67.     Zurbrigen asked Powerlift to construct the Showroom Door on wheels to easily allow Zurbrigen to transport this door to sales meetings with architects and high-end homebuilders.

68.     The Showroom Door cost Powerlift $48,000 to design and build.

69.     Powerlift shipped all three doors, fully assembled, through one of Powerlift's California-based regional representatives, Tom Green ("Green").

70.     Green left Powerlift's manufacturing shop in Lake Benton, Minnesota on or about May 15, 2020, to deliver the three doors to Zurbrigen.

71.     At Zurbrigen's direction, Green delivered the three hydraulic lift doors to Kozma Welding & Fabrication, located at 610 Charlotte Street, Punta Gorda, Florida 33950.

72.     Zurbrigen did not tell Peterson he instructed Green to deliver the three hydraulic lift doors to a welding shop, and Peterson did not learn this information until months after Green made the delivery.

73.     Upon information and belief, Zurbrigen delivered the Second Test Door to Blackwater for hurricane-approval testing, Blackwater performed its testing, and Blackwater scrapped the Second Test Door once testing finished.

74.     Zurbrigen will not tell Powerlift whether he sent the Second Test Door to Blackwater, and Blackwater likewise will not disclose this information without Zurbrigen's approval, which Zurbrigen refuses to give.

75.     In total, Powerlift invested over $234,750 in the research, design, construction, shipping, and other associated expenses for the First Test Door, Second Test Door, Bar Top Door, and Showroom Door.

76.     While Powerlift worked to design and build the Second Test Door, Bar Top Door, and Showroom Door, Zurbrigen had been working behind the scenes to steal Powerlift's hydraulic door frame design.

77.     Eleven days before Powerlift shipped the Second Test Door, Bar Top Door, and Showroom Door to Zurbrigen, Zurbrigen reached out to one of Powerlift's suppliers, International Fluid Power, Inc. ("International Fluid"), on May 4, 2020.  A copy of Zurbrigen's May 4, 2020 email to International Fluid is attached hereto as **Exhibit C**.

78.     Zurbrigen told International Fluid in this email he was "looking for a partner/supplier to provide power units, hoses, cylinders and accessories."  Zurbrigen did not disclose his affiliation with Powerlift.

79.     International Fluid's representatives and Zurbrigen engaged in several follow-up conversations regarding Zurbrigen's inquiry until International Fluid's

representatives realized Zurbrigen wanted to purchase the cylinders used in Powerlift's hydraulic lift door design.

80.     As discussed above, Powerlift had sent Zurbrigen trade secret and Confidential Information on its hydraulic lift door on January 27, 2020.

81.     International Fluid refused to engage in further discussions with Zurbrigen until he obtained Powerlift's express permission for discussions to continue.

82.      Zurbrigen never obtained this permission from Powerlift and never told Powerlift he had contacted International Fluid to obtain the same parts Powerlift uses on its hydraulic lift door.

83.     While working behind Powerlift's back to build a relationship with International Fluid, Zurbrigen continued to feign interest in an exclusive supplier relationship with Powerlift throughout May 2020.

84.     On May 12, 2020, Zurbrigen sent Peterson a signed a Letter of Intent, whereby the parties would officially memorialize their intent to pursue a co-marketing agreement for glass hydraulic lift doors.

85.     Peterson revised the terms of the Letter of Intent and Bennett sent Zurbrigen the revised Letter of Intent with the changes highlighted on May 13, 2020.

86.     Zurbrigen never responded to the proposed revisions and never signed the revised Letter of Intent.

87.     On June 15, 2020, Zurbrigen e-mailed Peterson and claimed—for the first time—that the fit and finish of the Bar Top Door and Showroom Door did not meet his

14

standards "to present these products to architects with a feeling of confidence."  Zurbrigen offered to ship these doors back to Powerlift or "scrap" them.  A copy of Zurbrigen's June 15, 2020 email to Peterson is attached as **Exhibit D**.

88.    Zurbrigen had never previously indicated he had any issues with the fit and finish of Powerlift's hydraulic lift doors, and Zurbrigen's actions subsequent to receiving these doors undermine his proffered excuse to cut ties with Powerlift.

89.    In fact, Zurbrigen had reached out to Powerlift's supplier, International Fluid, on May 4, 2020—more than a week before Powerlift shipped its Second Test Door, Bar Top Door, and Showroom Door to Zurbrigen's welding shop.  Zurbrigen obviously could not have known that the "fit and finish" of these doors did not meet his standards when he took steps to secure International Fluid as his supplier, thus confirming his intention to part ways with Powerlift well before his concocted excuse could have even arisen.

90.    Zurbrigen also used photographs of Powerlift's hydraulic lift door to advertise on Glass in Motion's website (without any attribution to Powerlift and in violation of his agreement with Powerlift).  Zurbrigen would not have used Powerlift's photographs if he believed Powerlift's hydraulic lift doors had fit and finish issues.

91.    Peterson spoke to Zurbrigen over the telephone on June 15, 2020, and Peterson and Zurbrigen discussed ways that Zurbrigen could try to fix the fit and finish of the Bar Top Door and Showroom to his satisfaction.  Zurbrigen agreed to at least attempt to fix the fit and finish of these doors to his satisfaction during this call.

92.    Zurbrigen also sent a follow-up e-mail to Peterson in the evening on June 15, 2020, outlining the steps Zurbrigen promised Peterson he would take during their phone call, including: (1) the removal of any photographs of Powerlift's bar lift units from Glass in Motion's website; (2) obtaining quotes for the cost to ship back Powerlift's rolling prototype hydraulic lift door; (3) removing the cylinders, fittings, and hoses from the bar top prototype hydraulic lift door and shipping those parts back to Powerlift; (4) attempting to improve the fit and finish of the steel frame on the prototype doors; (5) removing the other cylinders and hydraulic components from the second prototype hydraulic lift door and shipping those parts back to Powerlift; and (6) contacting Blackwater to obtain a "structural summary" of the hurricane test report for Powerlift.  A copy of Zurbrigen's second e-mail to Peterson on June 15, 2020, is attached hereto as **Exhibit E**.

93.    Zurbrigen did not fulfill any of the promises he made to Peterson in this June 15, 2020 email.

94.    On August 21, 2020, Zurbrigen e-mailed Peterson and repeated many of the same promises from his June 15, 2020 e-mail.  In particular, Zurbrigen reassured Peterson he was working to obtain the Blackwater structural test results, he was "in the process" of removing any Powerlift photographs from the Glass in Motion website, and he would put the rolling prototype hydraulic door on a pallet and ship it back to Powerlift partially disassembled.  A copy of Zurbrigen's August 21, 2020 e-mail to Peterson is attached as **Exhibit F**.

95.    Zurbrigen, once again, did not fulfill these promises.

16

96.    On August 26, 2020, Zurbrigen texted Peterson that the "[t]win panel is already patented and we have exclusive use rights."  The "twin panel" referred to Powerlift's bifold door.

97.    Powerlift's patent application for its bifold door hydraulic lift door is currently pending before the U.S. Patent & Trademark Office, and Powerlift is unaware of any other patents issued by the U.S. Patent & Trademark Office for a bifold hydraulic lift door.

98.    Zurbrigen further assured Peterson in this August 26, 2020 text message that he was "in the process of removing" Powerlift's photos from Glass in Motion's website and that he would forward Peterson "the air infiltration numbers" from the Blackwater testing report as soon as he got the chance.  Zurbrigen also requested that Peterson "send anything in writing from now on."  A copy of this text message is attached as **Exhibit G**.

99.    After Zurbrigen failed to ship back Powerlift's doors and parts for months, Bennett e-mailed Zurbrigen on August 28, 2020, and offered to arrange for a transport service to pick up Powerlift's doors and parts to ship these items back to Powerlift at Glass in Motion's expense.

100.    Bennett also reminded Zurbrigen in her August 28, 2020 e-mail that Powerlift needed a copy of the Blackwater test report.  A copy of Bennett's August 28, 2020 e-mail to Zurbrigen is attached hereto as **Exhibit H**.

101.    Zurbrigen agreed to work with Bennett to arrange for the return of these items.

102.    On September 2, 2020, Powerlift's counsel sent a Cease and Desist Letter to Zurbrigen, demanding that Zurbrigen: (1) provide a copy of the Blackwater test report to Powerlift; (2) remove all Powerlift material from Glass in Motion's website; (3) destroy any Glass in Motion print advertising that used Powerlift photographs, drawings, guides, or instructions; (4) destroy any electronic documents Zurbrigen received from Powerlift; (5) return any printed material Glass in Motion received from Powerlift; and (6) return Powerlift's three prototype hydraulic lift doors.  A copy of Powerlift's September 2, 2020 Cease and Desist Letter to Zurbrigen is attached hereto as **Exhibit I**.

103.    Powerlift's counsel also reminded Zurbrigen in this Cease and Desist Letter that Powerlift had filed patent applications in connect with its hydraulic lift doors and Powerlift held the copyrights for all photographs and drawings Glass in Motion continued to display on its website.

104.    Zurbrigen never responded to this Cease and Desist Letter.

105.    While Zurbrigen did remove some of Powerlift's photographs from Glass in Motion's website, the website still displays several of Powerlift's photographs.

106.    In mid-September 2020, Powerlift finally received the Showroom Door and the Bar Top Door that it sent Zurbrigen in May 2020.  Neither door showed any signs that Zurbrigen attempted to fix the fit and finish, as Zurbrigen had promised Peterson he would do.

107.    Both doors also arrived fully disassembled, even though Powerlift had shipped these doors to Zurbrigen fully assembled.

108.    Zurbrigen had no reason to disassemble these doors unless he intentionally disassembled them to reverse engineer the doors.

109.    On September 22, 2020, after receiving Powerlift's Cease and Desist Letter, Zurbrigen reached out to International Fluid yet again, seeking parts to construct a hydraulic lift door. A copy of Zurbrigen's September 22, 2020 e-mail to International Fluid is attached hereto as **Exhibit J**.

110.    Zurbrigen has no legitimate reason to repeatedly contact International Fluid to obtain the same cylinder parts Powerlift uses to construct its hydraulic lift door, unless Zurbrigen intends to replicate Powerlift's hydraulic lift door design in violation of the Confidentiality Agreement.

111.    On October 15, 2020, Zurbrigen emailed Bennett and Peterson to warn Powerlift away from trying to obtain "private information from Glass in Motion's vendors."  Zurbrigen stated in his email that the parties had agreed to the terms of the Letter of Intent and that Glass in Motion's website "has zero of [Powerlift's] information" including "no photos, no drawings, and no data."  A copy of Zurbrigen's October 15, 2020 e-mail to Bennett and Peterson is attached hereto as **Exhibit K**.

112.    As of the date of this Complaint, Glass in Motion's website still advertises Powerlift materials.

### COUNT ONE – BREACH OF CONTRACT
### (Zurbrigen)

113.    Powerlift readopts and realleges paragraphs 1 through 112 as if fully set forth herein.

114.   Powerlift and Zurbrigen entered into a Confidentiality Agreement on December 5, 2019.

115.   The Confidentiality Agreement prohibits Zurbrigen from making any "commercial use" of Powerlift's Confidential Information without Powerlift's prior written consent.

116.   Zurbrigen breached this provision of the Confidentiality Agreement by actively pursuing the cylinder parts necessary to build Powerlift's hydraulic lift door.

117.   The Confidentiality Agreement further states that the parties agree any breach constitutes irreparable harm and the non-breaching party is entitled to injunctive relief and reasonable attorneys' fees.

118.   Because Zurbrigen breached the terms of the Confidentiality Agreement, Powerlift is entitled to immediate injunctive relief and recovery of its attorneys' fees from Zurbrigen.

## COUNT TWO –DECLARATORY JUDGMENT FOR VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (Zurbrigen and Glass in Motion)

119.   Powerlift readopts and realleges paragraphs 1 through 112 as if fully set forth herein.

120.   Powerlift is a consumer as defined in Fla. Stat. § 501.203(7).

121.   Zurbrigen intentionally posted Powerlift's photographs and drawings on Glass in Motion's website, without any attribution to Powerlift, to falsely lead consumers

to believe that Glass in Motion authored these drawings and completed the projects depicted in the photographs.

122.    Zurbrigen's and Glass in Motion's conduct was unfair, unconscionable, and deceptive in violation of Fla. Stat. § 501.204(1).

123.    Powerlift is entitled to a declaratory judgment that Zurbrigen's and Glass in Motion's conduct violates Fla. Stat. § 501.204(1) and an injunction to enjoin Zurbrigen and Glass in Motion from continuing their deceptive conduct pursuant to Fla. Stat. § 501.211(1).

## COUNT THREE – UNJUST ENRICHMENT
### (Zurbrigen and Glass in Motion)

124.    Powerlift readopts and realleges paragraphs 1 through 112 as if fully set forth herein.

125.    Powerlift provided four hydraulic lift doors to Glass in Motion and Zurbrigen—the First Test Door, the Second Test Door, the Bar Top Door, and the Showroom Door.

126.    Powerlift only agreed to design, build, and ship these four custom doors to Zurbrigen because Zurbrigen promised to market and sell Powerlift's glass hydraulic lift doors.

127.    At Zurbrigen's request, Powerlift spent over $234,750 to design, build, and ship these four custom hydraulic lift doors to Glass in Motion and Zurbrigen.

128.    Powerlift also provided Zurbrigen and Glass in Motion with detailed specifications, photographs, and specialized drawings which contained trade secret and confidential information.

129.    Neither Glass in Motion nor Zurbrigen paid Powerlift for any of these doors or for any of the trade secret or confidential information.

130.    Upon information and belief, at least two of these doors—the First Test Door and the Second Test Door—were destroyed in Blackwater's hurricane-approval testing. Zurbrigen and Glass in Motion are the only two parties who retained any benefit from Blackwater's testing of these two doors because Powerlift did not obtain hurricane-approval certification for either door, and Zurbrigen refuses to share the Blackwater test reports with Powerlift, despite his many promises to do so.

131.    Zurbrigen shipped back the Showroom Door and the Bar Top Door fully disassembled.   By disassembling the doors, he learned valuable trade secret and confidential information that would allow him to reverse engineer the doors.

132.    It would be unjust to allow Zurbrigen and Glass in Motion to retain the value and use they derived from the benefit Powerlift conferred on them in the form of the four custom hydraulic lift doors Powerlift designed, built, and shipped to Zurbrigen and Glass in Motion, as well as the additional trade secret and confidential information Powerlift shared with Zurbrigen and Glass in Motion.

133.    Powerlift is therefore entitled to recover its damages, in an amount to exceed $75,000, for the money Powerlift expended to design, build, and ship these four custom

hydraulic lift doors to Zurbrigen and Glass in Motion, and for the additional trade secret and confidential information Powerlift shared with Zurbrigen and Glass in Motion.

## COUNT FOUR – VIOLATION OF LANHAM ACT
### (Zurbrigen and Glass in Motion)

134.   Powerlift readopts and realleges paragraphs 1 through 112 as if fully set forth herein.

135.   Powerlift sells hydraulic lift doors in interstate commerce.

136.   Glass in Motion advertises the sale of hydraulic lift doors in interstate commerce.

137.   The advertising used by Glass in Motion to attempt to sell hydraulic lift doors is false, misleading, and violates Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

138.   Glass in Motion's and Zurbrigen's unauthorized use of Powerlift's photographs and drawings on Glass in Motion's website has deceived—or has the capacity to deceive—a substantial segment of potential retailers and consumers because Glass in Motion and Zurbrigen have led these consumers to believe that Glass in Motion constructed the hydraulic lift doors depicted in Powerlift's photographs and authored the drawings.

139.   Glass in Motion's and Zurbrigen's deception is material because it is likely to influence a consumer's or a retailer's purchasing decision.

140.   Glass in Motion's and Zurbrigen's use of Powerlift's photographs also misrepresents the nature, characteristics, qualities, and geographic origins of Glass in Motion's goods.

141.    Upon information and belief, as a direct result of Glass in Motion's false and misleading advertising, Powerlift has lost sales and profits and suffered actual damages.

142.    Unless Glass in Motion is enjoined from continuing to make these false and misleading representations in its advertising and ordered to correct and redact these representations, the false and misleading representations will cause Powerlift to continue to suffer a loss of sales, profits, and goodwill.

143.    Further, because Glass in Motion engaged in the conduct described in this Complaint willingly, and with knowledge that its advertising and labeling is deceptive, Powerlift is entitled to recover its costs and attorney's fees.

WHEREFORE, Plaintiff Powerlift demands judgment against Defendants Zurbrigen and Glass in Motion as follows:

1.    For a preliminary and permanent injunction ordering that Defendants Zurbrigen and Glass in Motion, and their agents, employees, representatives, subsidiaries and affiliates:

a.    Abide by the terms of the Confidentiality Agreement and immediately cease use of Powerlift's Confidential Information and trade secret information;

b.    Remove any Powerlift materials advertised on any Glass in Motion material, including but not limited to, Powerlift's photographs and drawings that remain advertised on Glass in Motion's website; and

c.    Refrain from the design or construction of hydraulic lift doors.

24

2.      An award to Powerlift for its attorney's fees, costs, and disbursements for Zurbrigen's breach of the Confidentiality Agreement;

3.      An award to Powerlift for the compensatory damages it sustained by reason of Zurbrigen's and Glass in Motion's unjust enrichment;

4.      Awarding damages to Powerlift, including without limitation:

a.   Zurbrigen's and Glass in Motion's profits, gains, and advantages, if any, derived from their unlawful conduct, and such damages to be trebled pursuant to 15 U.S.C. § 1117;

b.   All damages sustained by Powerlift by reason of Glass in Motion's and Zurbrigen's unlawful conduct, including lost profits, lost sales, or other monetary damages, and such damages to be trebled pursuant to 15 U.S.C. § 1117; and

c.   Prejudgment interest on all sums awarded to Powerlift; and

5.      Such other and further relief as the Court deems just and equitable.

Dated: November 19, 2020

**HOGAN LOVELLS US LLP**

By */s/ Allen P. Pegg* .

Allen P. Pegg
Florida Bar No. 597821
600 Brickell Avenue
Suite 2700
Ph.: 305.459.6500
Fax: 305.459.6550
allen.pegg@hoganlovells.com

**ATTORNEYS FOR PLAINTIFF POWERLIFT DOOR CONSULTANTS, INC.**